UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MICHAEL T. LAWLER, and MEGAN
LAWLER,

                              Plaintiffs,

        -against-                                    1:12-CV-0327 (LEK/RFT)

GLOBALFOUNDRIES U.S., INC., and
M+W U.S., INC.,

                              Defendants.
_____

## MEMORANDUM-DECISION and ORDER

## I.    INTRODUCTION

        Plaintiffs Michael T. Lawler ("Lawler") and Megan Lawler (collectively, "Plaintiffs")

commenced this personal injury action against Defendants Globalfoundries U.S., Inc.

("Globalfoundries"), and M+W U.S., Inc. ("M+W") (collectively, "Defendants").  Dkt. No. 1

("Complaint").  Presently before the Court are the parties' Motions for summary judgment.  Dkt.

Nos. 35 ("Plaintiffs' Motion"); 42 ("Defendants' Motion").  For the following reasons, Plaintiffs'

Motion is granted in part and denied in part, and Defendants' Motion is denied in its entirety.

## II.   FACTS[1]

### A.  The Project

        Lawler worked as a pipefitter during the construction of a Globalfoundries semiconductor

_____

[1] Ordinarily, on a motion for summary judgment, a court must resolve all ambiguities and
draw all reasonable inferences in favor of the nonmoving party.  Reeves v. Sanderson Plumbing
Prods., Inc., 530 U.S. 133, 150 (2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d
736, 742 (2d Cir. 1998).  Where both parties have moved for summary judgment, it may thus be
necessary to distinguish their factual assertions accordingly.  However, in this case, the facts are, in
large part, not in dispute, and therefore the Court has consolidated the parties' factual statements for
purposes of this section.  The facts are undisputed except as noted.

fabrication plant (the "Fab") in Malta, NY.  Dkt Nos. 39-1 ("Plaintiffs' SMF") ¶ 1; ("Defendants'

Response SMF") ¶ 1.  Globalfoundries owned the building, and M+W was the general contractor.

Pls.' SMF ¶¶ 2-3; Defs.' Resp. SMF ¶¶ 2-3.  M+W managed all construction design and

construction activity on the project.  Pls.' SMF ¶ 7; Defs.' Resp. SMF ¶ 7.  Lawler was employed by

Westech Process Solutions ("Westech"), which was a subcontractor for certain work on the project,

including installation of semiconductor fabrication tools.  Pls.' SMF ¶ 9; Defs.' Resp. SMF ¶ 9; Dkt.

Nos. 46 ("Defendants' SMF") ¶ 7; 51 ("Plaintiffs' Response SMF") ¶ 7.  M+W was in charge of

hiring subcontractors for the tool installation portion of the project, and was also in charge of

providing safety materials to the crew performing the tool installation in October 2011.  Pls.' SMF

¶¶ 11-12; Defs.' Resp. SMF ¶¶ 11-12.

The Clean Room is the portion of the Fab where semiconductor manufacturing takes place.

Defs.' SMF ¶ 10.  It is designed to allow the installation of the tools involved in the manufacturing

process.  See id. ¶¶ 8, 14.  The tools sit on a raised metal floor ("RMF") that is 36 inches above a

prefabricated concrete floor referred to as the "waffle slab."  Id. ¶ 14.  The RMF consists of 2 foot

by 2 foot square floor tiles assembled over an aluminum framework that sits on the waffle slab.  Id.

The RMF tiles can be removed using a suction cup, allowing access to the interstitial space between

the RMF and the waffle slab.  Id.  Various utility connections (e.g. water, gas, power, exhaust,

drains) are routed up through the waffle slab.  Id. ¶ 15.  These utilities are then routed through the

sub-RMF space and connected to the tools through openings in the RMF.  Id. ¶ 16.

Lawler's job duties in relation to the Clean Room included bending piping that would

eventually be installed in the sub-RMF space.  Defs.' SMF ¶ 19; Pls.' Resp. SMF ¶ 19.  Lawler later

worked to actually install the pipes in the Clean Room.  Defs.' SMF ¶ 20; Pls.' Resp. SMF ¶ 20.

This work included conducting a trial run of the eventual installation of one of the initial toolings. Defs.' SMF ¶ 20; Pls.' Resp. SMF ¶ 20. In anticipation of the tool's arrival, Lawler and others situated pipes, ran piping, and installed supports both above and below the flooring. Defs.' SMF ¶ 20; Pls.' Resp. SMF ¶ 20.

## B. The Accident

On the day of the accident, Lawler was working with a co-worker, Robbie Sellers ("Sellers"). Defs.' SMF ¶ 22; Pls.' Resp. SMF ¶ 22. In order to perform the assigned work, Lawler and Sellers removed two RMF floor tiles, creating two openings in the RMF eight to twelve feet from each other. Pls.' SMF ¶ 33; Defs.' Resp. SMF ¶ 33. Sellers was assigned to work underneath the RMF installing pipe. Pls.' SMF ¶ 32; Defs.' Resp. SMF ¶ 32. Plaintiffs state that Lawler was assigned to assist Sellers from on top of the RMF by handing him tools and materials through the hole created by the removal of one of the RMF tiles. Pls.' SMF ¶ 32. Defendants state that Lawler was acting as a spotter or hole watcher for Sellers. Defs.' Resp. SMF ¶ 32.

Sellers entered the interstitial space below the RMF through one of the holes created by removing the RMF tiles. Pls.' SMF ¶ 33; Defs.' Resp. SMF ¶ 33. For multiple single tile openings, Globalfoundries and M+W's rules called for using either a non-rigid/soft barricade with a spotter, or a rigid barricade and no spotter. Pls.' SMF ¶ 44; Defs.' Resp. SMF ¶ 44; Dkt. No. 37-7 ("RMF Opening Rules"). Lawler and Sellers set up plastic barricades around the perimeter of the area in which they were working. Pls.' SMF ¶ 43; Defs.' Resp. SMF ¶ 43. These barricades were set up two tiles back from the openings and were there to protect bystanders from falling into the openings or entering the work area. Pls.' SMF ¶ 46; Defs.' Resp. SMF ¶ 46.

At the time of the accident, Lawler was lying on top of the RMF, adjacent to the access hole.

Pls.' SMF ¶ 36; Defs.' Resp. SMF ¶ 36.  Another Westech employee requested a copy of a drawing that Lawler had in a tool chest.  Pls.' SMF ¶ 36; Defs.' Resp. SMF ¶ 36.  Lawler stood up, took a step to his left, and fell into the access hole, sustaining serious injuries.  Pls.' SMF ¶ 36; Defs.' Resp. SMF ¶ 36.

### C. Investigation

M+W maintains a standard operating procedure of reviewing all safety incidents with their subcontractors at a daily 6:30 a.m. meeting.  See Pls.' SMF ¶ 47; Defs.' Resp. SMF ¶ 47.  M+W reviewed this incident with Westech management to establish what occurred, and what Westech was expected to do to resolve or mitigate any risks.  Pls.' SMF ¶ 48; Defs.' Resp. SMF ¶ 48.  In response to Lawler's accident, an initial Construction Incident Analysis ("CIA") was conducted and a report was issued within 24 hours of the accident.  Pls.' SMF ¶¶ 49-50; Defs.' Resp. SMF ¶¶ 49-50; Dkt. No. 37-2 ("Initial CIA").  Westech was in charge of completing the Initial CIA.  Pls.' SMF ¶¶ 50-51; Defs.' Resp. SMF ¶¶ 50-51.  The standard operating procedure called for the M+W safety manager to review the Initial CIA and set up a formal CIA with the subcontractor.  Pls.' SMF ¶ 52; Defs.' Resp. SMF ¶ 52.  Globalfoundries expected M+W to conduct the investigation of the accident, perform a root cause analysis, and plan corrective actions.  Pls.' SMF ¶ 53; Defs.' Resp. SMF ¶ 53.

In response to Lawler's accident, a formal CIA was conducted and a report dated October 20, 2011, was issued.  Pls.' SMF ¶ 54; Defs.' Resp. SMF ¶ 54; Dkt. No. 37-3 ("Formal CIA").  The purpose of the CIA was to create a correct account of the facts surrounding the incident, and to identify contributing factors and potential corrective actions.  Pls.' SMF ¶ 55; Defs.' Resp. SMF ¶ 55.  M+W provided Globalfoundries with a copy of the Formal CIA, which describes the

4

contributing factors as inadequate inspection of the area, inattention/distraction, and inadequate guarding of hazards. Pls.' SMF ¶ 56; Defs.' Resp. SMF ¶ 56; Formal CIA at 3. Two corrective and preventive actions are listed for consideration: (1) "Coordinate with Construction Area Lead (CAL) to have rigid barricades set around multiple tiles to allow for easier access and have the spotter conduct operations from outside of the barricade (recommendation)," and (2) "When available use the 'manhole type' barricade to limit exposure of spotter to open holes." Id. ¶ 4. A manhole-type barricade is placed directly over an opening and is secured with straps. Pls.' SMF ¶ 58; Defs.' Resp. SMF ¶ 58. In October 2011, Westech did not have any manhole-type barricades on site, although other sub-contractors did. Pls.' SMF ¶¶ 59, 61; Defs.' Resp. SMF ¶¶ 59, 61. M+W was aware that Westech did not have such barricades, and Globalfoundries did not require such barricades for multiple single tile openings. Pls.' SMF ¶¶ 60, 62; Defs.' Resp. SMF ¶¶ 60, 62.

### D. Procedural History

Plaintiffs commenced this action on February 24, 2012, asserting claims under New York Labor Law §§ 240(1), 241(6), and 200, as well as common-law negligence and loss of consortium claims. Compl. Plaintiffs filed their Motion on October 21, 2013, seeking summary judgment on the Labor Law § 240(1) and § 241(6) claims. Pls.' Mot.; Dkt. 39 ("Plaintiffs' Memorandum"). Defendants filed a Response and Plaintiffs filed a Reply. Dkt. Nos. 56 ("Defendants' Response"); 60 ("Plaintiffs' Reply").

Defendants filed their Motion on October 29, 2013, seeking summary judgment on the § 240(1) and § 241(6) claims, as well as the § 200 claim. Defs.' Mot.; Dkt. No. 42-1 ("Defendants' Memorandum"). Plaintiffs filed a Response. Dkt. No. 52 ("Plaintiffs' Response").

# III.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) instructs a court to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991).

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the non-moving party will bear the burden of proof on a specific issue at trial, the moving party may satisfy its own initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim.  Id.  If the moving party carries its initial burden, then the non-moving party bears the burden of demonstrating a genuine issue of material fact.  Id.  This requires the nonmoving party to do "more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Corp., 475 U.S. 574, 586 (1986).

If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial.  Celotex, 477 U.S. at 331 (Brennan, J., concurring).  Such an affirmative showing shifts the burden of production to the party opposing the motion and requires that party either to produce evidentiary materials that demonstrate the existence of a genuine issue for trial or to submit an affidavit

6

requesting additional time for discovery.  Id.

In either case, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  Reeves, 530 U.S. at 150; Nora Beverages, Inc., 164 F.3d at 742.  A court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them."  Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV.     DISCUSSION

### A.  Labor Law § 240(1)

New York Labor Law § 240(1) provides that

> [a]ll contractors and owners and their agents, . . . in the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed.

N.Y. LAB. LAW § 240(1).  The statute "requires owners and contractors to provide proper protection to those working on a construction site," and "imposes absolute liability where the failure to provide such protection is a proximate cause of a worker's injury."  Fabrizi v. 1095 Ave. of Americas, L.L.C., 8 N.E.3d 791, 794 (N.Y. 2014).  Accordingly, to prevail on a § 240(1) claim, a plaintiff must show that (1) the statute was violated and (2) the violation was the proximate cause of his injury.  See Blake v. Neighborhood Hous. Servs. of New York City, 803 N.E.2d 757, 761 (N.Y. 2003).  Once those elements are established, contributory negligence of the plaintiff cannot be raised as a defense.  See id.

Plaintiffs assert that Defendants are absolutely liable for Lawler's injuries under the statute.

7

Pls.' Mem. at 1-7. Defendants argue that the statute does not apply because: (1) Lawler was not working at an "elevated work site" at the time of his injury; and (2) Lawler was not engaged in construction or similar work at the time of his injury. Defs.' Resp. at 5-18. Defendants argue in the alternative that (3) if the statute applies to this situation, Defendants are nevertheless not liable because the absence of a safety device was not a proximate cause of Lawler's injuries. Id. at 18-19.

### 1. Elevated Work Site

"Whether a plaintiff is entitled to recovery under Labor Law § 240(1) requires a determination of whether the injury sustained is the type of elevation-related hazard to which the statute applies." Wilinski v. 334 E. 92nd Hous. Dev. Fund Corp., 959 N.E.2d 488, 491 (N.Y. 2011). This inquiry centers on "whether the injured worker's task creates an elevation-related risk of the kind that the safety devices listed in section 240(1) protect against." Salazar v. Novalex Contracting Corp., 960 N.E.2d 393, 395 (N.Y. 2011) (internal quotation marks omitted). "The kind of accident triggering section 240(1) coverage is one that will sustain the allegation that an adequate scaffold, hoist, stay, ladder or other protective device would have shielded the injured worker from harm directly flowing from the application of the force of gravity to an object or person." Id. at 396; see also Wilinski, 959 N.E.2d at 492 ("[A] defendant's failure to provide workers with adequate protection from reasonably preventable, gravity-related accidents will result in liability.").

Here, Plaintiff was injured when he stepped into a four square foot manhole created by the removal of a tile from the RMF. See Pls.' SMF ¶¶ 36-37. Because there was no device over or directly around the hole, nothing prevented gravity from causing Plaintiff to fall into the hole. "Keeping in mind that section 240(1) 'is to be construed as liberally as may be for the accomplishment of the purpose for which it was thus framed,'" Carpio v. Tishman Const. Corp. of

New York, 658 N.Y.S.2d 919, 921 (App. Div. 1997) (quoting Quigley v. Thatcher, 100 N.E. 596, 506 (N.Y. 1912)), the Court finds that Lawler's accident falls within the scope of the statute.

Defendants cite several cases in arguing to the contrary. See Defs.' Resp. at 8-10. First, Defendants point to Wells v. British American Development Corporation, 770 N.Y.S.2d 161 (App. Div. 2003), for the proposition that mere proximity to an opening in a floor does not render § 240(1) applicable. Defs.' Resp. at 10. However, Wells is distinguishable for two reasons. First, the work the plaintiff was performing did not require him to be at an elevation; the adjacent pit he fell into had nothing to do with the work he was performing at the time. See 770 N.Y.S.2d at 162. Here, on the other hand, Lawler's duties—whether those of a spotter, as Defendants contend, or acting as an assistant to a fellow worker who was below the RMF, as Plaintiffs contend—were only necessary because of the height differential between the RMF and the concrete floor below. See Pls.' SMF ¶ 32; Defs.' Resp. SMF ¶ 32; Wells, 770 N.Y.S.2d at 164 (stating that § 240(1) applies to "work which was required to be performed at the upper elevation differential" (internal quotation marks omitted)). Second, the plaintiff in Wells fell into a pit when the ground he was standing on collapsed. 770 N.Y.2d at 162. Accordingly, "[h]e did not require the use of one of the devices contemplated by Labor Law § 240(1)." Id. at 163. Here, given the more predictable danger created by deliberately opening a hole in the floor, the type of guard or railing that Plaintiffs contend would have prevented Lawler's fall fits more easily within the category of devices contemplated by the statute. See Salazar, 960 N.E.2d at 396. Accordingly, Wells does not support Defendants' position.

Defendants also rely heavily on D'Egidio v. Frontier Insurance Company, 704 N.Y.S.2d 750 (App. Div. 2000). See, e.g., Defs.' Resp. at 8-10. That case involved a worker stepping into a hole created by the removal of a tile from a "raised computer floor." 704 N.Y.S.2d at 764. However, the

floor opening there was 5 by 12 inches, or 60 square inches, and the raised floor was elevated 15 to 24 inches, id., presenting less of a fall danger than the setting in this case—a 576 square inch hole in a floor raised 36 inches above the subfloor. Defendants also cite Piccuillo v. Bank of New York, 716 N.Y.S.2d 20 (App. Div. 2000), and Geonie v. OD & P NY, 855 N.Y.S.2d 498 (App. Div. 2008). Defs.' Resp. at 9. Those cases also involved workers stepping into openings in raised access floors of less significant depth and size. See Geonie, 855 N.Y.S.2d at 496 (opening left by removal of tile for a raised "computer floor"); Piccuillo, 716 N.Y.S.2d at 94 (electrician stepped into 12-inch wide and 8-inch deep "hand-hole" designed to allow access to wiring and ducts below floor); see also Carpio, 658 N.Y.S.2d at 921-22 (finding § 240(1) applied where worker fell into hole 10-14 inches wide and three feet deep). Accordingly, the Court finds Defendants' argument unpersuasive, and rules in favor of Plaintiffs on this issue.

### 2. Construction Activity

"While the reach of section 240(1) is not limited to work performed on actual construction sites, the task in which an injured employee was engaged must have been performed during 'the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure.'" Martinez v. City of New York, 712 N.E.2d 689, 691 (N.Y. 1999) (quoting statute) (internal citation omitted). "[T]he question whether a particular [activity] falls within section 240(1) must be determined on a case-by-case basis, depending on the context of the work." Prats v. Port Auth. of N.Y. & N.J., 800 N.E.2d 351, 354 (N.Y. 2003)

Defendants first argue that Plaintiff was not engaged in a covered activity because "construction-related activities in the Clean Room were substantially complete and the Clean Room was operational" by the date of the accident. Defs.' Resp. at 12-13. In support of this contention,

10

Defendants provide an affidavit from Globalfoundries' Manager of Facilities Engineering stating that the Clean Room zone in which Plaintiff was injured had reached "ready for equipment" status on July 15, 2011, meaning that it was ready for the installation of equipment. Dkt. No. 44 ("Thomas Affidavit") ¶¶ 4, 7. Furthermore, by October 6, 2011, the Clean Room was "operational with construction complete, including floor, walls, ceilings, and doors." Id. ¶ 8.

Although the walls, floor, and ceiling of the building may have been erected, liability under § 240(1) is not limited to work performed on a "building construction site." Joblon v. Solow, 695 N.E.2d 237, 241 (N.Y. 1998). Rather, the statute applies to "erection, demolition, repairing, altering, painting, cleaning or pointing of a building *or structure*." N.Y. LAB. LAW § 240(1) (emphasis added). "Under Labor Law § 240(1), a 'structure' is any production or piece of work artificially built up or composed of parts joined together in some definite manner." Lewis-Moors v. Contel of N.Y., Inc., 578 N.E.2d 434, 434 (N.Y. 1991). Accordingly, Plaintiff's injury is covered so long as he was engaged in altering a structure. "Altering," for purposes of section 240(1), "requires making a *significant* physical change to the configuration or composition of the building or structure." Joblon, 695 N.E.2d at 241. A "simple, routine activity" is not significant enough to fall within the statute's coverage. Id. at 242.

Here, Lawler was working with Sellers to install piping below the RMF, including attaching the piping to connections that came up through the waffle slab. See Pls.' SMF ¶¶ 32, 34. Lawler was therefore engaged in making a significant physical change to a piece of work composed of parts that were to be joined together in a definite matter—i.e., a structure. See Weininger v. Hagedorn & Co., 695 N.E.2d 709, 710 (N.Y. 1998) (finding that worker running computer and telephone cables through ceiling to new office space was engaged in altering a structure); Ferris v. Benbow Chem.

Packaging, Inc., 905 N.Y.S.2d 394, 395-96 (App. Div. 2010) (finding that worker engaged in installing pipe system was altering a structure).

Defendants nevertheless argue that Lawler was not engaged in the alteration of a building or structure, citing the proposition that "implementing a change to a structure that is inherent to the structure itself" does not constitute alteration. Defs.' Resp. at 16 (quoting Len v. State, 906 N.Y.S.2d 622, 626 (App. Div. 2010)). Defendants emphasize that the RMF and other components of the Clean Room were designed to accommodate this installation of tooling—i.e., the RMF floor tiles were readily removable using a suction cup device. See Resp. at 17; Thomas Aff. ¶ 12. However, Len involved a worker moving a movable dam on a canal. 906 N.Y.S.2d at 623. The moving of the dam was itself the function of the structure. Id. ("[D]ebris routinely became caught in the movable dam parts necessitating its removal each time the dam sections were lifted or lowered."). Here, Plaintiff was engaged in the installation of piping as part of a larger tool installation project, which was itself part of the larger project of building the Fab. Defendants' argument merely demonstrates that the Clean Room was designed to allow alteration of its components during the tool installation process; the Clean Room clearly underwent a significant physical change during tool installation. Additionally, the piping, once installed below the RMF, was apparently intended to stay there for an indefinite period of time. See Defs.' SMF ¶¶ 14-16. In other words, a change was made to "permanently alter the physical structure involved." Len, 906 N.Y.S.2d at 626.

Finally, Defendants also argue that Lawler was not engaged in construction and alteration because, at the time of his injury, he was acting as a spotter—i.e., he himself was not installing

piping.[2]  Defs.' Resp. at 14.  Although it is true that courts look to the "time of injury" to determine whether a plaintiff's work fell within § 240(1), that requirement should not be interpreted in "an overly literal manner."  Prats, 800 N.E.2d at 353.  "[I]t is neither pragmatic nor consistent with the spirit of the statute to isolate the moment of injury and ignore the general context of the work."  Id.  "The intent of the statute was to protect workers employed in the enumerated acts, even while performing duties ancillary to those acts."  Id.

Here, Lawler was employed as a pipefitter.  See Pls.' SMF ¶ 1; Defs.' SMF ¶ 19.  His job duties regarding the Clean Room varied; he was initially tasked with bending pipe for later installation in the Clean Room, and was subsequently tasked with delivering those pipes to the Clean Room for installation.  Defs.' Resp. SMF ¶ 17.  Although Lawler was engaged in an ancillary duty—assisting a fellow worker who was installing pipe beneath the RMF—at the exact moment of the injury, his injury is nevertheless covered by the statute because he was substantially employed to perform work that involved alteration of a building or structure.  See Prats, 800 N.E.2d at 353.  Accordingly, Plaintiffs are entitled to judgment as a matter of law on this element of the § 240(1) claim.

### 3.  Causation

Defendants argue that, even if the statute was violated, the lack of a safety device was not the proximate cause of Lawler's injuries because (1) an appropriate safety device would not have protected Lawler, and (2) Lawler's injuries resulted from his own lack of due care.  Defs.' Resp. at 18-19.

---

[2] As noted *supra*, Plaintiffs dispute this characterization of Lawler's job duties at the time of the accident.  Pls.' SMF ¶ 32.

Defendants first argue that "safety devices would not have been appropriate nor would they have protected" Lawler. Id. at 18. More specifically, Defendants argue that the manhole barricade mentioned in the Formal CIA, and in Plaintiffs' Memorandum, "could not have been used because it is ineffective since securing them 'would almost certainly damage the' equipment beneath the [RMF] and also damage the floor." Id. (quoting Dkt. No. 35-6 at 54-56). However, the statute places the burden of supplying a safety device on the owner and contractor, not on the worker. See Fabrizi, 8 N.E.3d at 794. Accordingly, "the contention that no other safety device was appropriate is unavailing"; Lawler is not "required to prove what additional safety devices would have prevented his injury." Miranda v. Norstar Bldg. Corp., 909 N.Y.S.2d 802, 807 (App. Div. 2010); see also Noble v. AMCC Corp., 714 N.Y.S.2d 495, 497 (App. Div. 2000).

Defendants next argue that Lawler's injuries resulted from his own "lack of due care" and "inattentiveness." Defs.' Resp. at 19. Defendants are essentially arguing that Lawler's own negligence contributed to his injury, but "a claim of comparative negligence on [Lawler's] part" cannot "defeat summary judgment, unless [his] conduct was the sole proximate cause of his accident." Vergara v. SS 133 W. 21, LLC, 800 N.Y.S.2d 134, 136 (App. Div. 2005). "The sole proximate cause defense does not apply where a plaintiff was not provided with an adequate safety device as required by the Labor Law." DeRose v. Bloomingdale's Inc., 986 N.Y.S.2d 127, 130 (App. Div. 2014) (alterations omitted). Here, it is undisputed that no safety device was provided to Lawler.[3]

---

[3] To the extent that Defendants seek to argue that Lawler was protected because he received safety training regarding RMF openings and was specifically trained to act as a hole spotter, "it has previously been established that neither coworkers nor safety instructions constitute safety devices" for purposes of § 240(1). Miranda, 909 N.Y.S.2d at 807; see also id. ("[T]he word 'device' as used in Labor Law § 240(1) does not include a system in which a person acts as a safety monitor, spotter,

"[W]here there is no view of the evidence at trial to support a finding that the absence of safety devices was not a proximate cause of the injuries, the court may properly direct a verdict in the plaintiff's favor." Zimmer v. Chemung Cnty. Performing Arts, Inc., 482 N.E.2d 898, 903 (N.Y. 1985). Here, Lawler's injuries resulted from stepping into a hole in the floor. No safety device had been placed around or above the hole to prevent him from stepping into it, or from falling into it once he stepped there. Based on these facts, no rational factfinder could conclude that the absence of a safety device was not at least one proximate cause of Lawler's accident. Accordingly, Plaintiffs are entitled to judgment as a matter of law on the issue of liability under Labor Law § 240(1).

**B.  Labor Law § 241(6)**

New York Labor Law § 241(6) states:

> All areas in which construction, excavation or demolition work is being performed shall be so constructed, shored, equipped, guarded, arranged, operated and conducted as to provide reasonable and adequate protection and safety to the persons employed therein or lawfully frequenting such places. The [Commissioner of Labor] may make rules to carry into effect the provisions of this subdivision, and the owners and contractors and their agents for such work . . . shall comply therewith.

N.Y. LAB. LAW § 241(6). The statute "requires owners and contractors to provide reasonable and adequate protection and safety for workers and to comply with the specific safety rules and regulations promulgated by the Commissioner of the Department of Labor." St. Louis v. Town of N. Elba, 947 N.E.2d 1169, 1170 (N.Y. 2011). Because the statutory duty imposed is nondelegable, a plaintiff need not show that the defendants exercised supervision or control over the work site in order to establish liability. Id. However, "comparative negligence remains a cognizable affirmative defense to a section 241(6) cause of action." Id.

---

or lookout.").

15

Defendants argue that Lawler's injury is not covered by Labor Law § 241(6) because: (1) Lawler was not performing construction, excavation, or demolition work; and (2) Defendants did not violate any provision of the Industrial Code. Resp. at 18-21. Additionally, Defendants argue that (3) if Labor Law § 241(6) applies to Lawler's accident, they are not liable because the lack of additional safety devices was not the proximate cause of Lawler's injuries. Defs.' Resp. at 22-23.

Plaintiffs, in requesting summary judgment in their favor, argue that Lawler's injury resulted solely from Defendants' negligence. Pls.' Mem. at 8.

### 1. Construction

Defendants argue that Plaintiff was not engaged in "significant structural work" or in any other activity covered by § 241(6). Defs.' Resp. at 18-20. However, as discussed *supra* in relation to § 240(1), Lawler was engaged in permanently altering a structure. Accordingly, because the Industrial Code includes "alteration . . . of buildings or other structures" in its definition of construction work, Joblon, 695 N.E.2d at 242 (citing N.Y. COMP. CODES & REGS. tit. 12, § 23-1.4(b)(13)), Plaintiff was engaged in construction work for the purposes of § 241(6) for the reasons stated *supra*, see Joblon, 695 N.E.2d at 242 (finding that plaintiff stated claim under § 241(6) where he was engaged in "altering" under § 240(1)).

### 2. Industrial Code

To be entitled to summary judgment on a § 241(6) claim, a plaintiff must establish a violation of the Industrial Code. See Blair v. Cristani, 745 N.Y.S.2d 468, 469 (App. Div. 2002). Here, Plaintiffs claim that Defendants violated, *inter alia*, Industrial Code § 23-1.7(b)(1)(i). Pls.' Mem. at 8.

Section 23-1.7(b)(1)(i) provides that "[e]very hazardous opening into which a person may

step or fall shall be guarded by a substantial cover fastened in place or by a safety railing constructed and installed in compliance with this Part (rule)." N.Y. COMP. CODES & REGS. tit. 12, § 23-1.7. "This regulation is sufficiently specific to serve as a predicate for a Labor Law § 241(6) claim, but it does not apply to every gap or opening." Coleman v. Crumb Rubber Mfrs., 940 N.Y.S.2d 170, 172 (App. Div. 2012) (alteration and internal citations and quotation marks omitted). "Case law has established that an opening must be of 'significant depth and size' to fall within the regulation's protection." Id. (quoting D'Egidio, 704 N.Y.S.2d at 753). "No specific minimum size has been established, but . . . many cases applying this provision reference a hole 'large enough for a person to fall through to a lower area.'" Coleman, 940 N.Y.S.2d at 172 (quoting Wells, 770 N.Y.S.2d at 164, and collecting cases). "It is not necessary, however, that an injured worker actually fall all the way through such an opening to sustain a claim premised on this regulation, and an opening 14 to 16 inches wide has been found sufficiently large to support such a claim." Coleman, 940 N.Y.S.2d at 172 (internal citations omitted).

Here, the hole was 24 by 24 inches wide and three feet deep—large enough for someone to fall from the RMF level to the waffle slab level below. Accordingly, the hole in the RMF was hazardous for purposes of § 23-1.7.

Defendants cite Geonie in arguing to the contrary. Defs.' Resp. at 23. Geonie found that stepping into an opening left by the removal of a tile in a raised "computer floor" did not fall within the statute. 885 N.Y.S.2d at 497. As discussed *supra* regarding the Labor Law § 240(1) claim, the interstitial space here was more significant; it was both of greater depth, and provided space for a number of utility connections to complex manufacturing tools, not simply computer wires.

Accordingly, Plaintiffs are entitled to judgment as a matter of law on the issue of whether the

Industrial Code was violated for purposes of a § 241(6) claim.

### 3. *Proximate Cause/Comparative Negligence*

"[O]nce it has been alleged that a concrete specification of the Code has been violated, it is for the jury to determine whether the negligence of some party to, or participant in, the construction project caused plaintiff's injury." Rizzuto v. L.A. Wenger Contracting Co., Inc., 693 N.E.2d 1068, 1071 (N.Y. 1998); see also Wojcik v. 42nd St. Dev. Project, 386 F. Supp. 2d 442, 453 n.12 (S.D.N.Y. 2005) ("[A] violation of § 241(6), unlike a violation of § 240(1) is only some evidence of negligence on the part of the owner or contractor."); Shannon v. Lake Grove Ctrs., Inc., 118 F. Supp. 2d 343, 349 (E.D.N.Y. 2000) ("[V]iolation of a rule or regulation promulgated pursuant to Section 241(6) does not impose absolute liability without regard to fault or negligence, but is merely some evidence of negligence."). "[B]ecause absolute liability is not imposed by proof of a violation of the regulations promulgated under § 241, contributory and comparative negligence are viable defenses to § 241(6) claims." Wojcik, 386 F. Supp. 2d at 453 n.12; see also Rizzuto, 693 N.E.2d at 1071 ("An owner or general contractor may, of course, raise any valid defense to the imposition of vicarious liability under section 241(6), including contributory and comparative negligence.").

Defendants argue that Lawler's own negligence caused his injuries, see Defs.' Resp. at 23, and Plaintiffs argue that Lawler was not negligent at all, Pls.' Mem. at 8. This factual dispute cannot be resolved on summary judgment. Accordingly, Plaintiffs are entitled to summary judgment that Defendants violated Labor Law § 241(6), but summary judgment is denied as to the issues of causation and comparative negligence.

### C. Labor Law § 200

Labor Law § 200 "is a codification of the common-law duty imposed upon an owner or

general contractor to maintain a safe construction site." <u>Rizzuto</u>, 693 N.E.2d at 1073. "[A]n implicit precondition to this duty is that the party to be charged with that obligation have the authority to control the activity bringing about the injury to enable it to avoid or correct an unsafe condition." <u>Id.</u> (alteration and internal quotation marks omitted). "General supervisory authority at a worksite for the purpose of overseeing the progress of the work and inspecting the work product is insufficient to impose liability . . . under Labor Law § 200." <u>Perri v. Gilbert</u>, 790 N.Y.S.2d 25, 29 (App. Div. 2005). Additionally, "a general duty to ensure compliance with safety regulations or the authority to stop work for safety reasons is insufficient to raise a triable issue of fact" on such a claim. <u>McCormick v. 257 W. Genesee, LLC</u>, 913 N.Y.S.2d 435, 437 (App. Div. 2010); <u>see also</u> <u>Perri v. Gilbert Johnson Enters., Ltd.</u>, 790 N.Y.S.2d 25, 29 (App. Div. 2005) ("[T]he authority to review safety at the site is insufficient if there is no evidence that the defendant actually controlled the manner in which the work was performed."); <u>Shelley v. Flow</u>, 724 N.Y.S.2d 244, 245 (App. Div. 2001) ("The contractual duty to oversee the performance of work, inspect the work site and ensure compliance with safety regulations does not constitute supervision and control over the subcontractor's methods of work.").

Defendants argue that they did not supervise or control the work in which Lawler was engaged. Defs.' Mem. at 23-24. Plaintiffs respond that Defendants actually controlled the safety practices and procedures employed at the job site. Pls.' Resp. at 17-21.

The record reveals that Defendants did more than merely maintain general supervisory and stopping authority over the project. Rather, they dictated the safety procedures used by Lawler and Sellers on the day of the accident. <u>See</u> RMF Opening Rules. Furthermore, M+W was responsible for providing safety equipment to Westech's employees. Pls.' SMF ¶¶ 11-12; Defs.' Resp. SMF

¶¶ 11-12. Defendants exercised actual control over the manner in which Lawler and Sellers were working, and therefore were in a position to correct the job site danger at issue. See Behagan v. L&L Painting Co., 858 N.Y.S.2d 97, 97 (App. Div. 2008) (upholding denial of summary judgment where defendant controlled "safety equipment requirements"). Because there is no genuine dispute as to the material fact that Defendants actually controlled the safety procedures used, Plaintiffs are entitled to summary judgment on the issue of liability on the § 200 claim.[4]

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion (Dkt. No. 42) for summary judgment is **DENIED in its entirety**; and it is further

**ORDERED**, that Plaintiffs' Motion (Dkt. No. 35) for summary judgment is **GRANTED in part and DENIED in part**; and it is further

**ORDERED**, that summary judgment is **GRANTED** to Plaintiffs as follows: (1) Defendants are liable under Labor Law § 240(1); (2) the accident at issue falls within the scope of Labor Law § 241(6); and (3) Defendants owed Lawler a duty under Labor Law § 200; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

---

[4] Although only Defendants moved for summary judgment on this issue, where, as here, the analysis reveals that there are no genuine issues of material fact and that the law is on the side of the non-movant, summary judgment may properly be granted in favor of the non-movant. Orix Credit Alliance, Inc. v. Horten, 965 F. Supp. 481, 484 (S.D.N.Y. 1997) (citing 10A CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 2720 (2d ed. 1983)).

**IT IS SO ORDERED**.

DATED:        September 30, 2014
              Albany, New York

Lawrence E. Kahn
U.S. District Judge